UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

Eastern District of Kentucky
F I L E D

AUG 3 1 2005

AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 04-511-GWU

VICTOR ESTEP,                                                    PLAINTIFF,

VS.                          **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,                   DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative

denial of his application for Disability Insurance Benefits (DIB). The appeal is

currently before the Court on cross-motions for summary judgment.

## APPLICABLE LAW

The Sixth Circuit Court of Appeals has set out the steps applicable to judicial

review of Social Security disability benefit cases:

1.    Is the claimant currently engaged in substantial gainful activity?
      If yes, the claimant is not disabled. If no, proceed to Step 2.
      See 20 C.F.R. 404.1520(b), 416.920(b).

2.    Does the claimant have any medically determinable physical
      or mental impairment(s)? If yes, proceed to Step 3. If no, the
      claimant is not disabled. See 20 C.F.R. 404.1508, 416.908.

3.    Does the claimant have any severe impairment(s)--i.e., any
      impairment(s) significantly limiting the claimant's physical or
      mental ability to do basic work activities? If yes, proceed to
      Step 4. If no, the claimant is not disabled. See 20 C.F.R.
      404.1520(c), 404.1521, 416.920(c), 461.921.

1

4.    Can the claimant's severe impairment(s) be expected to result
      in death or last for a continuous period of at least 12 months?
      If yes, proceed to Step 5. If no, the claimant is not disabled.
      See 20 C.F.R. 404.920(d), 416.920(d).

5.    Does the claimant have any impairment or combination of
      impairments meeting or equaling in severity an impairment
      listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of
      Impairments)? If yes, the claimant is disabled. If no, proceed
      to Step 6.    See 20 C.F.R. 404.1520(d), 404.1526(a),
      416.920(d), 416.926(a).

6.    Can the claimant, despite his impairment(s), considering his
      residual functional capacity and the physical and mental
      demands of the work he has done in the past, still perform this
      kind of past relevant work? If yes, the claimant was not
      disabled.    If no, proceed to Step 7.    See 20 C.F.R.
      404.1520(e), 416.920(e).

7.    Can the claimant, despite his impairment(s), considering his
      residual functional capacity, age, education, and past work
      experience, do other work--i.e., any other substantial gainful
      activity which exists in the national economy? If yes, the
      claimant is not disabled.    See 20 C.F.R. 404.1505(a),
      404.1520(f)(1), 416.905(a), 416.920(f)(1).

Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

Applying this analysis, it must be remembered that the principles pertinent

to the judicial review of administrative agency action apply.    Review of the

Commissioner's decision is limited in scope to determining whether the findings of

fact made are supported by substantial evidence. Jones v. Secretary of Health and

Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991). This "substantial

evidence" is "such evidence as a reasonable mind shall accept as adequate to

support a conclusion;" it is based on the record as a whole and must take into

2

account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the detracting factors in the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms. 20 C.F.R. Section 404.1529 (1991). However, in evaluating a claimant's allegations of disabling pain:

First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

3

Estep

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment. The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability. Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984). However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the Court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

4

Estep

Step six refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. 416.965(a) and 20 C.F.R. 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most

5

of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's

6

physical and mental impairments. Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Victor Estep, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of polysubstance dependency (allegedly in short-term remission), left shoulder impingement syndrome, status post acute renal failure, coronary artery disease (status post several myocardial infarctions exacerbated by polysubstance abuse/dependency), pancreatitis, alcohol abuse, and osteoarthritis. (Tr. 23). Nevertheless, based in part on the testimony of a vocational expert (VE), the ALJ determined that Mr. Estep retained the residual functional capacity to perform a significant number of jobs existing in the economy and, therefore, was not entitled to benefits. (Tr. 24-8). The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ had asked the VE whether a person of the plaintiff's age, education, and work experience could perform any jobs assuming that he were limited to light level exertion, and also had the following non-exertional impairments. (Tr. 73). He: (1) could not climb ladders/ropes/scaffolds or perform work with his hands overhead; (2) could occasionally bend, stoop, twist, kneel, squat, crouch, crawl, push, pull, operate foot pedal controls with the left foot, and climb ramps and stairs; (3) could have no concentrated exposure to vibration or temperature extremes; and (4) required entry-level work with no frequent changes

7

in work routines. (Tr. 73-4). The VE responded that there were jobs that such a person could perform, and proceeded to give the numbers in which they existed in the state and national economies. (Tr. 74-5).

On appeal, this Court must determine whether the administrative decision is supported by substantial evidence.

Mr. Estep alleged disability beginning September 26, 2001 due to impingement syndrome in his left shoulder, back problems, joint pain, two heart attacks, and hearing and vision problems. (Tr. 116). He testified that the administrative hearing that he had developed the heart problems beginning in 1995 or 1996, and altogether had had five heart attacks. (Tr. 51). He admitted, however, that cocaine use could have played a part in the heart attacks, and that it seemed that every time he used the drug, he had a problem with his heart. (Tr. 51-2). He asserted at the July 12, 2004 hearing that he had not abused drugs since May 16, 2004. (Tr. 52).

Regarding the plaintiff's musculoskeletal impairments, the ALJ's residual functional capacity finding is supported by a functional capacity assessment completed by Dr. James Templin on October 25, 2002. Although Dr. Templin noted tenderness over the left shoulder and a decreased range of motion, as well as midline tenderness in the lower lumbar spine, he felt that the plaintiff could lift up to 40 pounds occasionally and 10 pounds repetitively, could do no frequent bending, stooping, kneeling, squatting, crouching, lifting, or carrying, and should not use the

left foot repetitively to operate foot controls. (Tr. 547-51). Another one-time examiner, Dr. Hughes Helm, examined the plaintiff on February 20, 2003 and found almost no abnormalities to examination other than some radiculopathy to the left heel on straight leg raising. (Tr. 573-5). Dr. Helm concluded that Mr. Estep would have no impairment in his ability to sit, hear, speak, or travel, but would have an unspecified impairment standing, moving about, lifting, carrying, or handling objects, particularly due to unstable angina, but also due to low back pain. (Tr. 576). State agency physicians who reviewed a portion of the record concluded that Mr. Estep could perform light level work, should never climb ladders, ropes, or scaffolds, could occasionally climb ramps and stairs, stoop, kneel, and crouch, and had a limited ability to reach overhead with the left arm. (Tr. 558-70, 581-91). These restrictions are compatible with the ALJ's functional capacity conclusions.

The ALJ rejected the functional capacity assessment given by Dr. Roy Varghese in May, 2004. Dr. Varghese limited the plaintiff to lifting no more than 10 pounds, and felt that he could perform less than full-time sitting, standing, and walking, as well as having other restrictions. (Tr. 870-2). Dr. Varghese ascribed the limitations to back pain and coronary artery disease, and added "he had a heart attack and he is getting retested." (Id.). However, the medical records show that the plaintiff saw Dr. Varghese on only a few occasions, and that the doctors made no significant physical findings during his examinations other than low back tenderness and rhonchi, on an occasion when the plaintiff was complaining of cough and

congestion. (Tr. 667-8, 683). Another physician at the same medical office as Dr. Varghese ordered a CT scan of the lumbar spine in September, 2003 to investigate complaints of back pain, but the scan was read as negative. (Tr. 679-82). Mr. Estep informed the physician that he did not want the pain medications offered, and requested "something like Percocet." The physician suggested that he see a specialist for chronic pain control. (Tr. 680).

Medical records from the plaintiff's treating coronary physicians at the University of Kentucky Medical Center (UKMC) indicate that he was repeatedly hospitalized for myocardial infarctions, including an occasion in June, 2000, prior to his alleged onset date, when the discharge diagnosis was an acute myocardial infarction with left heart catheterization and percutaneous transluminal coronary angioplasty of a previous right coronary artery stent, "tobacco abuse," hyperlipidemia, and high blood pressure. (Tr. 231). He was again hospitalized at UKMC in October, 2001 for a grade three laceration of the spleen after a motor vehicle accident, but was discharged with no specific restrictions. (Tr. 363). Another hospitalization at UKMC occurred in July, 2003, with a discharge diagnosis of an acute inferior myocardial infarction, subacute thrombosis of stent, hypertension, hyperlipidemia, and substance abuse. (Tr. 611). Mr. Estep admitted to the physicians that he drank alcohol occasionally, used marijuana occasionally, smoked one pack of cigarettes a day, and had used cocaine three days before his admission. (Tr. 612). Angioplasty was performed, and he was discharged free of chest pain and

10

Estep

feeling well, but advised that in light of his significant coronary artery disease he "absolutely must discontinue using cocaine." (Tr. 614).     Another admission followed in December, 2003, and a catheterization showed a complete occlusion of the proximal right coronary artery, but once again the treating surgeon noted a history of tobacco abuse and cocaine abuse, and that the plaintiff admitted to using cocaine as recently as the previous week.  (Tr. 747, 752, 876).  He also had concerns about the patient's compliance with his cardiac medications as an outpatient. (Tr. 752).  Other notes indicate that the plaintiff was warned by several UKMC staff members about the dangers of cocaine and "the disease process." (Tr. 753, 795, 860, 867, 875-7).  Nevertheless, the plaintiff was admitted for another myocardial infarction on May 16, 2004 after his wife found him "unresponsive," and a urine drug screen showed cocaine, benzodiazepine, and opiates.  (Tr. 967-8, 1235).  He was admitted with a diagnostic impression of "cocaine-associated myocardial infarction," and acute renal failure with hyperkalemia.  (Tr. 978-80). Another catheterization showed restenosis of the right coronary artery, and a stent was placed.  (Tr. 969, 1130). His stay in the hospital was prolonged by abnormal liver function tests, acute renal failure requiring dialysis, right upper lobe pneumonia, and bleeding caused by a catheter used for dialysis. (Tr. 967 --9). It was felt that he probably would not require dialysis over the long-term (Tr. 971).[1]On discharge, he

---

[1] Mr. Estep confirmed at the administrative hearing that this was correct.  (Tr. 56-7).

11

Estep

was afebrile, had stable vital signs, and was ambulating without difficulty. (Tr. 971).

Activity was "ad lib." (Tr. 974). Therefore, more recent evidence than Dr. Varghese

does not suggest that the plaintiff would have any specific limitations due to cardiac

disease, even apart from the issue of drug abuse and non-compliance with

prescribed treatment.[2]

The plaintiff argues on appeal that he meets the requirements of the

Commissioner's Listing of Impairment (LOI) 4.04C. This section states that disability

will be assumed where a plaintiff can show:

> Coronary artery disease, demonstrated by angiography (obtained
> independent of Social Security disability evaluation), and an evaluating
> program physician, preferably one experienced in the care of patients
> with cardiovascular disease, has concluded that performance of
> exercise testing would present a significant risk to the individual, with
> both 1 and 2: 1) Angiographic evidence revealing: a. Fifty percent or
> more narrowing of a non-bypassed left main coronary artery...2.
> Resulting in marked limitation of physical activity, as demonstrated by

---

[2]The plaintiff also submitted additional evidence to the Appeals Council, consisting of a functional capacity assessment by his cardiologist, Dr. L. Todd Justice. The assessment was dated August 25, 2004, some 13 days after the administrative decision was issued. Dr. Justice opined, however, that while the plaintiff's prognosis was guarded, it was "reasonable to expect that he could be made symptom-free but also reasonable to expect progression/worsening." (Tr. 1650). Nevertheless, he opined that the plaintiff could both sit and stand/walk at least six hours in an eight-hour day, did not need the option of sitting or standing at will, that he might need unscheduled breaks depending on the job. (Tr. 1651). He noted: "If manual labor, will be constant issue. If sedentary, should never happen." (Id.). He felt that the plaintiff could lift 10 pounds frequently and 20 pounds occasionally, would have no limits on his ability to bend and twist, and needed to avoid exposure to extreme cold, extreme heat, and fumes, odors, dust, and gases. (Tr. 1652). He was not aware of any other limitations. (Id.). While the plaintiff suggests that this evidence supports his claim of disability, it would appear to be consistent with a wide range of light level work.

12

Estep

fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (2004).

Clearly, no physician, much less an evaluating program physician, has suggested that the plaintiff would meet this Listing. Moreover, it appears from the evidence that the plaintiff's heart disease was in his right coronary artery, rather than the left coronary artery specified by the Listing. Therefore, this argument is without merit.

The plaintiff also argues that his shoulder condition meets another Listing, quoting the language of LOI 1.02B, although, as the Commissioner points out, without specifically identifying it. This Listing, however, requires for finding of disability in the case of a "major dysfunction of a joint(s) (due to any cause)":

> [C]haracterized by gross anatomical deformity... and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s), and [ if a major weight-bearing joint is not involved, involvement of] one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (2004). The plaintiff had a normal right shoulder x-ray in May, 2001 (Tr. 474) and the examinations by Dr. Templin and Dr. Helm did not indicate any limitation on performing fine or gross movements. In any case, the

13

Estep

Listing requires that *both* upper extremities be affected, and the plaintiff has, at most, a problem with his right shoulder.  Therefore, this Listing is clearly not met, either.

Finally, the plaintiff argues that the ALJ did not give sufficient reasons for finding his allegations of pain not totally credible.  However, an examination of the administrative decision shows that the ALJ's discussion was adequate.  He noted that there was evidence that the plaintiff drove every day, cooked, washed dishes, which grocery shopping, fished, and visited his grandchild.  (Tr. 24).

The decision will be affirmed.

This the ____*31*____ day of August, 2005.

G. WIX UNTHANK
SENIOR JUDGE

14